UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-61386-CIV-UNGARO/REID
16-60007-CR-ZLOCH

CARLINE MAURICE

v.

UNITED STATES OF AMERICA
_____/

GOVERNMENT'S RESPONSE IN OPPOSITION TO PETITIONER
CARLINE MAURICE'S MOTION UNDER 28 USC § 2255 TO VACATE, SET
ASIDE OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

The United States of America respectfully submits that petitioner Carline Maurice's Motion To Vacate, Set Aside Or Correct Sentence, DE 1[1], should be denied, since its claims are refuted by the record and otherwise fail to state sufficient grounds for relief.

INTRODUCTION

A grand jury charged the movant and codefendants with conspiracies to commit wire fraud and identity theft, and with substantive wire fraud and identity theft violations.   CRDE 3. These charges addressed a fraudulent tax refund scheme that used the personal information of deceased individuals to make false claims for tax refunds. *Id.*

Movant and her codefendants each exercised their right to a jury trial.   The jury convicted movant and codefendant Maurice Exavier of all counts charged in the indictment.   CRDE 99, 100. A third codefendant, Jimmy Alexandre, was acquitted.

Movant received a sentence of incarceration for 132 months.   CRDE 136:2.   She appealed.   Her conviction was affirmed.   *United States v. Exavier*, 783 Fed.Appx. 849 (11th Cir.

_____

1 Docket entry (DE) 1 is under the civil case number; docket entries under the criminal case number appear with the prefix "CRDE".

1

2019).   That opinion  summarized  the evidence from movant's trial as follows:

> Exavier and Maurice were principals of Broward Financial Services, LLC ("BFS"), Advance Tax and Accounting Services, Inc. ("ATAS"), and Advance Tax and Accounting Services 2 ("ATAS2"). All three companies provided tax preparation services. Alexandre worked as a tax preparer for a separate business called "Mr. Cash and Associates" ("Mr. Cash"). The government alleges that through these businesses, defendants arranged to file false tax returns on behalf of deceased individuals and have refund checks deposited into bank accounts that Exavier and Maurice controlled.

> To facilitate electronic filing, the Internal Revenue Service ("IRS") assigns individual tax preparers a Preparer Tax Identification Number ("PTIN"). Similarly, the IRS assigns tax preparation businesses an Electronic Filing Identification Number ("EFIN"). Both the EFIN and PTIN are specific to that business or individual, and cannot be transferred or reassigned. When a tax preparation business files an electronic return, it must include both the EFIN for the business and the PTIN for the individual tax preparer.

> In 2003, the IRS issued an EFIN to BFS. In March of 2008, the IRS issued a PTIN to Exavier so that he could file tax returns for BFS clients. In 2009, in addition to tax preparation services, BFS obtained a state license as a money services business to offer check cashing services for tax preparation clients. The EFIN for BFS became inactive in November of 2010, and the IRS suspended its authorization to file tax returns electronically.

> In July of 2010, Exavier and Maurice established ATAS, with Maurice as president and Exavier as vice president. The IRS issued an EFIN to ATAS.

> On September 10, 2010, a Florida corporation called The Tax Doctors of Broward County reorganized to become ATAS2, with the same business address as ATAS. On September 30, 2010, the IRS issued an EFIN to ATAS2.

> In early 2011, ATAS electronically filed 158 income tax returns seeking $536,430 in refunds for deceased individuals. In this same period, ATAS2 electronically filed 312 returns for deceased individuals claiming $1,069,752 in refunds. All of these refunds were filed under EFINs for ATAS and ATAS2 and Maurice's PTIN. Each return included the correct name, birth date, and social security number of the decedent, but listed false information regarding employment, income, contact information, tax credits, deductions, and dependents. The IRS did not actually owe refunds on any of these returns.

2

In transactions involving a paid tax preparer, a taxpayer can direct the IRS to deposit the refund in the bank account of a designated third party. The third party pays the tax preparer directly, then deducts a processing fee and pays the balance to the taxpayer. ATAS and ATAS2 used Santa Barbara Tax Products Group ("SBTPG") to process refunds and pay tax preparation fees. SBTPG sent blank checks to ATAS and ATAS2 and when it received refunds from the IRS, authorized them to print cashier's checks for the taxpayers. The government claimed that defendants used this arrangement so that Maurice and Exavier could deposit refund checks for deceased individuals into accounts which they controlled.

On January 19, 2011, after reviewing nine tax returns that had been filed for deceased individuals under the ATAS EFIN, SBTPG terminated its relationship with ATAS. Other than a few refund checks that issued before it discovered the fraud, SBTPG did not actually issue refunds for the fraudulent returns that ATAS and ATAS2 had filed. SBTPG did deposit tax preparation fees into their bank accounts, however, with ATAS receiving approximately $54,457 and ATAS2 receiving $245,569. Of the $54,457 which ATAS received, $4,000 was traced to Maurice and $2,000 to Exavier, with the balance largely used to pay "1099 commissions" to various unspecified individuals. Of the $245,569 which ATAS2 received, $10,000 was transferred to Maurice through checks, $59,000 was transferred to Exavier through checks, $5,000 was transferred to a BFS bank account, and nine checks totaling $20,350 were made payable to cash. The balance apparently remained in the ATAS2 account or was not directly traceable to defendants.

Alexandre worked as a tax preparer for Mr. Cash in early 2011. He received permission from the company's owner, Yanel Laroche, to file electronic tax returns for his "friends," *i.e.*, tax preparers who had lost their EFINs but who nevertheless wished to service some 1,000 clients. Between January 28 and March 3, 2011, Alexandre filed 363 tax returns electronically under Mr. Cash's EFIN and his own PTIN. Of those 363 tax returns, 345 sought refunds amounting to $1,708,910 in the names of deceased individuals. Like the fraudulent returns which ATAS and ATAS2 filed, Alexandre's returns contained the correct names, birth dates, and social security numbers of the decedents, but listed false information regarding employment, income, contact information, tax credits, deductions, and dependents.

For Alexandre's returns, Mr. Cash used SBTPG to process refunds and pay tax preparation fees. In March of 2011, SBTPG contacted Laroche to alert him that tax returns had been filed for "dead people" under Mr. Cash's EFIN. Laroche discovered that Alexandre had prepared all of those tax returns. When SBTPG detected the fraud, it had already authorized checks for many of the refunds claimed in those returns. Among them, SBTPG had authorized $555,939 in refunds on 161 checks that were printed in the Mr. Cash office and deposited into a BFS business checking account that listed Exavier and Maurice as authorized signatories. Alexandre, who did not have a physical office at Mr. Cash, was the

only individual who had picked up refund checks that SBTPG issued for the fraudulent returns. SBTPG paid $965,585 in refunds that the IRS funded for the 345 fraudulent tax returns that Alexandre prepared in early 2011.

Approximately 97 percent of the checks deposited into the BFS business checking account in the first quarter of 2011 were tax refund checks. At trial, IRS Special Agent Bradley Cohen testified that in addition to the 161 refund checks related to Alexandre's returns, BFS deposits included 491 refund checks totaling $1,785,683 from returns filed by tax preparers other than defendants, ATAS, ATAS2, or Mr. Cash. Of this amount, $639,610 was transferred to another BFS account which listed Maurice and Exavier as signatories. From that account, checks totaling $57,250 were paid to Maurice, $40,500 to Exavier, $19,000 to Exavier's wife, $4,000 to ATAS, and $360,298 to cash. Of the checks made payable to cash, $28,000 was traced to a joint account that belonged to Exavier and his wife. Agent Cohen did not opine on the legitimacy of all of the refund checks from other tax preparers, but he analyzed 100 of the 491 refunds. He found that more than 60 of the refund checks were for deceased individuals and that 18 of them were for incarcerated individuals, two of whom were serving life terms.

Agent Cohen testified that documents from the Office of Financial Regulation had listed BFS as a check cashing and money transmitter business. Agent Cohen testified that in November of 2009, when Exavier applied for a Florida business license, he represented that his check cashing operation was limited to cashing checks for tax clients. Agent Cohen testified that in February of 2012, when he went to visit the principal place of business which BFS listed on its annual report, he did not see any sign which represented that check cashing services were offered there. Agent Cohen testified that from 2010 through 2016, BFS moved several times to and from the most recent address on record with the State of Florida (2033 University Drive, Sunrise, Florida) and where ATAS and ATAS2 were located (930 and 938 N.E. 62 Street, Oakland Park, Florida).

. . .

Maurice . . . did not testify. Through counsel, she suggested that someone had forged her signature, established bank accounts in her name, *and used her PTIN without her knowledge*. A handwriting expert testified that "she didn't write the signature on certain of the documents that were submitted" and that as to other documents, his findings were "inconclusive." The expert eliminated Maurice as the signatory on three documents, including two checks, but he could not eliminate her as the person who signed the remaining documents.

783 Fed. Appx. At 852-55 (emphasis added).[2]

_____

[2] A detailed summary of the evidence is also available from the government's responsive brief on

As reflected the final paragraph of the summary above, movant's trial counsel attacked the prosecution's case during trial with challenges to the sufficiency of the government's evidence. Defense attacks included trial counsel's efforts to demonstrate that movant's PTIN was not confidential and could have been used by others.  As early as his opening statement, defense counsel remarked:

> And now this thing, this euphemism again about a [PTIN].   It's on the tax returns. They can't be confidential if it's made public.   You pull it up.   You can see it. It's an identifier for the tax return. . . .   it was routine in certain businesses . . . that the [PTIN] would be used.

DE 159:31.   Various prosecution witnesses testified, however, that the IRS required that PTIN's be maintained securely, that they were not public records, and that they could not be researched online. DE 159:103-04, 105, 106; DE 160:8; DE 162:48 (not possible to Google a PTIN), 159 (a PTIN is "not a public record").   Movant's attorney cross-examined these witnesses concerning PTIN confidentiality, DE 159:139-41; DE 162:48, and was able to elicit testimony that a taxpayer requesting a copy from the IRS of the taxpayer's own previously filed return would then be able to see the preparer's PTIN.   DE 159:140-41. Defense counsel's challenge to the confidentiality of movant's PTIN formed part of an effort to argue that fraudulent returns using her PTIN could have been filed by someone other than movant.

Counsel for movant also attempted to cast doubt on evidence of movant's connection to bank accounts associated with the fraud scheme.   *See* CRDE 159:31 (in opening statement, listing deficiencies in prosecution evidence, stating "not any monies" connected movant to the fraud). As reflected in the opinion quoted above, movant's counsel asserted through cross-examination that movant lacked knowledge of the accounts.   CRDE 163:41-42 (bank employee did not

---

appeal, available at 2018 WL 10471119.

directly contact movant regarding accounts opened in her name).  He also asserted that the prosecution did not provide adequate evidence that movant received fraud proceeds or funds from the relevant accounts. CRDE 163:156 (questioning who cashed checks payable to movant). Counsel's attack on the government's financial evidence included objections its admission, where movant's counsel argued:

> Your honor, I have a substantial issue with the government's theory to total these moneys flowing to my client when the checks that are in her name in thousands of dollars are not hers, she did not author them. The government doesn't have the indication that she did. They don't have any indication that merely because of her name on them, and they are obvious forgeries.
>
> So to allege or give the jury the impression that she received these moneys on these checks that -- these are not the same people, but these are accounts that have her name on it.  And I think that it's inappropriate and it certainly misleads the jury.
>
> To throw a number out there 57,000 when I've got 7,500, 2,000, 7,000, 1,800, 6,000 that are not -- although my client's name is on it, these are not negotiated or signed off by her. Someone else signed them. And flipping the page briefly, I was aware that the pretrial order had a 14-day Daubert on it. I hired a handwriting expert.  I gave that report to the government. I gave it to Mr. Kulik and to Mr. Wilcox. It is an open question. There are forgeries that have my client's name on them.
>
> I think it's 403, prejudicial to us to have that number on a piece of paper. And the jury is going to have a computer. They can make their own comparisons to how much money went to my client. I don't have a dog in the hunt with respect to the other defendants. Where my client is concerned, we have bona fide grounds that these are not moneys that went to her. They certainly weren't signed by her. We submit it's unduly prejudicial, Your Honor.

CRDE 163:87-88.

The court overruled the objection.  CRDE 163:88. The jury was not persuaded by counsel's challenges.  As noted above, the jury convicted movant on all counts charged, and movant appealed.  Movant's attorney filed a brief, available at 2017 WL 1406661, claiming that the prosecution's evidence was insufficient and the district court erred by declining to sever

movant's trial from that of her codefendants.  *See also* 783 Fed.Appx. at 852 (listing movant's claims).  Movant also joined Exavier with the claim that certain information had supposedly been withheld from the defense.  After the United States filed its brief in opposition, movant's counsel filed a reply brief, available at 2018 WL 3018243.  The Eleventh Circuit issued its opinion affirming movant's convictions on July 30, 2019.

Within a year of that decision, movant timely filed her Section 2255 petition, which was docketed on July 10, 2020. [3]  DE 1.  In that petition, movant makes the following three claims in an attempt to vacate her conviction: 1) her attorney failed to communicate an unspecified plea offer from the United States; 2) her attorney failed to raise a defense at trial based on her PTIN's lack of confidentiality and the inadequacy of evidence connecting her to bank accounts and fraud proceeds; and 3) her attorney failed to consult with movant about issues to raise on appeal, resulting in the omission of certain arguments that movant wanted to make.

Movant's claims concerning her PTIN and counsel's challenges to financial evidence are refuted by the record.  Her remaining claims, as explained below, do not provide a sufficient basis for relief.  All of movant's claims should be summarily denied. [4]

---

[3] The one-year limitations period runs from the last of four specified events: 1) the date on which the judgment of conviction becomes final; 2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action; 3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or 4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.   28 U.S.C. 2255(f)(1)-(4).

[4] Movant has not requested a hearing, and none is warranted, since the record clearly refute movant's claims or as explained in this response, her claims do not state sufficient grounds for relief.

LEGAL ANALYSIS

I. <u>Movant Received Effective Assistance Before The Trial Court</u>

To evaluate movant's allegations of ineffective assistance of counsel, this Court must apply the standards announced in *Strickland v. Washington*, 466 U.S. 668 (1984), which held that "the proper standard of attorney performance is that of reasonably effective assistance," and that the burden is on a criminal defendant to show that "counsel's representation fell below an objective standard of reasonableness." *Id*. at 667-88.   To determine if a defendant has met this burden:

> a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance of counsel must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.   The court must then determine whether, in light of all of the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.

<u>Id</u>. at 690.

The burden of proof for demonstrating ineffective assistance of counsel remains on the petitioner throughout a habeas corpus proceeding.  *Roberts v. Wainwright*, 666 F.2d 517, 519, n.3 (11th Cir.), *cert. denied*, 459 U.S. 878 (1982); *Jones v. Kemp*, 678 F.2d 929, 932 (11th Cir. 1982).

There is a strong presumption that trial counsel provided adequate assistance and made all significant decisions in the exercise of reasonable, professional judgment.  *Strickland*, 466 U.S. at 688-90.  Unless movant can demonstrate prejudice, no relief or evidentiary hearing is called for concerning his claims.  *Harich v. Dugger*, 844 F.2d 1464, 1471, n.7 (11th Cir. 1988)(*en banc*), *cert. denied*, 489 U.S. 1071 (1989).

To establish prejudice, a petitioner must show a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.  *E.g.,*

*Boyd v. Allen*, 592 F.3d 1274, 1293 (11th Cir. 2010).   To establish prejudice in the context of a guilty plea, movant must show a reasonable probability that but for counsel's errors, she would not have pleaded guilty and would have insisted on going to trial.   *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).   Notably, "counsel owes a lesser duty to a client who pleads guilty than to one who decides to go to trial, and in the former case counsel need only provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed decision and conscious choice between accepting the prosecution's offer and going to trial." *Wofford v. Wainwright*, 748 F.2d 1505, 1508 (11th Cir. 1984); *Searcy v. Florida Dep't of Corrections*, 485 Fed.Appx. 992, 997 (11th Cir. 2012).

Movant fails to meet both of the requirements of *Strickland*, sometimes called the performance prong and the prejudice prong.   Failure to show either prong should result in denial of claims of ineffective assistance of counsel, and the court need not even reach both prongs, if either one fails. *See Michael v. Crosby*, 430 F.3d 1310, 1319-1320 (11th Cir. 2005).   In *Michael*, the Court stated:

> Under Strickland [v. Washington, 466 U.S. 668 (1984)], in order to demonstrate that counsel was ineffective, a petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that counsel's deficient performance affected the outcome of the trial. 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. If a defendant fails to make a showing as to either performance or prejudice, she is not entitled to relief. Id. at 697, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Thus, we need not address the prejudice prong if we find that the performance prong is not satisfied. Turner v. Crosby, 339 F.3d 1247, 1279 (11th Cir.2003), cert. denied, 541 U.S. 1034, 124 S.Ct. 2104, 158 L.Ed.2d 718 (2004); Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir.2000) ( "Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa." (citation omitted)).

In movant's case, both prongs fail.   While noting that a petitioner retains the burden of proving by a preponderance of the evidence that her counsel's performance was unreasonable, the Eleventh Circuit has also emphasized that judicial scrutiny of a lawyer's performance "must be highly deferential." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000)(*en banc*).   There is a strong presumption in favor of competence, making a habeas petitioner's burden of persuasion a heavy one.   *Id*. The presumption of competence remains even where the record is silent or ambiguous.   *Id*. at 1315, n.15.   Even where the petitioner presents some evidence to the contrary, the government never has the burden of showing competence.   *Id*. at 1315.   Where courts examine the performance of experienced trial counsel, the presumption of competence is even stronger.   *Id*. at 1316.

In fact, the degree of incompetence that would warrant relief must be extreme.   A petitioner must show more than the best possible strategy for his case, or even a better strategy than what his lawyer pursued.   Instead, movant must demonstrate that no competent counsel would have done what his attorney did.   *See Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998).   "Even the best criminal defense attorneys would not defend a particular case in the same way." *Strickland*, 466 U.S. at 689.   Effectiveness has nothing to do with what the best lawyers would have done, or even with what most good lawyers would have done. The inquiry is whether some reasonable lawyer could have acted, under the circumstances, as defense counsel acted. *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995)(*en banc*).

Against such standards, movant faces significant obstacles.   Her efforts to overcome them fail.   Movant fails to show either deficient performance on the part of counsel or any resulting prejudice.

A. Movant Provides Inadequate Grounds For Relief Based On An Allegedly
   Uncommunicated Plea Offer

Movant protests that in a post-conviction conversation, her attorney made a passing reference to an unspecified "deal" that movant should have taken.  DE 1:14.  According to movant, she was never informed of any deal offered by the government. *Id*. Without additional information or explanation, movant appears to argue that this limited information depicts ineffective assistance from her lawyer. It does not.

Movant's claim about her attorney's supposed remark is simply speculative.  It does not establish that the prosecution ever extended a formal plea offer.  Moreover, movant does not identify the terms of any supposed offer, or what terms, if any, she would have accepted.  Movant does not claim that if she had known of an offer, she would have chosen not to exercise her right to trial.  Additionally, movant has made no attempt to show that the Court would have accepted the terms of any offer, or that these unknown terms would have resulted in a lesser sentence.  These omissions are significant,  and defeat movant's claim.

To prevail on a claim of deficient performance based on counsel's failure to communicate a plea bargain, a defendant must show, at a minimum, not only that she would have accepted an offer which counsel failed to communicate, but also that the prosecution would not have withdrawn the offer and the court would have accepted it.  *E.g., Missouri v. Frye*, 566 U.S.134 (2012); *see also Osley v. United States*, 751 F.3d 1214, 1223-24 (11th Cir. 2014)(rejecting defendant's claim that he would have accepted a 15-year plea bargain as "wholly speculative" since it was unclear what terms the prosecution would have offered)(the lack of definition in a plea offer makes it substantially harder to determine it likely that a plea acceptable to the defendant would have been entered without the prosecution canceling it or the trial court refusing to accept

it); *Scott v. United States*, 325 Fed.Appx. 822, 825 (11th Cir. 2009)(affirming district court's denial of Section 2255 petition without a hearing where movant did not allege prosecution was amenable to negotiating away statutory sentencing enhancement).   Movant must also show that acceptance of an uncommunicated offer would have resulted in a less severe conviction or sentence. *Osley*, 751 F.2d at 1222, quoting *Lafler v. Cooper*, 566 U.S. 156, 164 (2012).

Movant's petition addresses none of these factors.   Even its description of an unspecified, passing, post-conviction reference by counsel to a "deal" is not enough to establish that the deal in question, if any, concerned a pre-trial offer of a plea bargain.   Accordingly, the claim about communication of an alleged plea bargain is deficient, and should be denied.[5]

B.  The Record Refutes Movant's Claims About Her Trial

Movant claims that her trial counsel was ineffective for failing to challenge prosecution claims about the confidentiality of PTIN's.   In fact, counsel made repeated attempts to establish reasonable doubt with assertions that movant's PTIN was accessible to others, beginning with his opening statement.   DE 159:31. Counsel also questioned government witnesses who rejected his efforts to dispute the confidentiality of PTIN's.   CRDE 159:103-06, 154; DE 160:8; CRDE 161:48, 159.   Nevertheless, defense counsel was able to elicit testimony that in the limited circumstances where a taxpayer 1) requested a copy of his or her own return, 2) from the IRS, 3) after filing, the PTIN would appear on that copy of the return.   CRDE 159:139-41.   When

---

5 Other claims in movant's petition alleging her attorney's failure to suggest that others rather than movant committed the charged offenses are effectively protestations of innocence, and undermine even the inference that movant would have accepted any plea bargain if one had been offered. *See, e.g., Osley*, 751 F.3d at 1224 (repeated claims of innocence, while not dispositive, are relevant considerations for whether a plea bargain would have been accepted).   Unlike her choice at trial, movant testified at her sentencing, where she also disputed the evidence against her in a manner inconsistent with assuming responsibility for the offenses of conviction.   DE 132:1-9.   Her persistent denials do not support the likelihood that movant was prepared to admit guilt as part of a plea bargain.

codefendant Alexandre testified, movant's counsel elicited that when Alexandre prepared returns, he never had to type his own PTIN. CRDE 163:155 (implying that tax preparation software pre-filled the PTIN which would somehow make it less confidential).

Movant's claim that counsel failed to challenge the confidentiality of PTIN's simply is not true. For that reason, the claim is meritless, provides no basis for relief, and should be denied.

Movant also objects that the fraudulent tax returns filed with her name as the preparer did not contain her signature, and counsel "failed to object to the verification of Petitioner's signature on the filed tax returns." DE 1:15. The record also refutes this claim.

For example, during movant's trial, the United States called Kristy Morgan, an IRS employee who had the role, among others, of records custodian. CRDE 159:94-96. Movant's counsel cross-examined Ms. Morgan, asking whether, during a review of exhibits before taking the stand, she saw "a single signature on any return with Carline Maurice's name on it, a handwritten signature?" DE CR159:152. Thus, counsel did, in fact, challenge movant's connection to returns with her name as the preparer, based on the absence of a signature.[6] Defense counsel also questioned other witnesses, such as relatives of deceased taxpayers, about the absence of movant's signature on returns. *E.g.*, CRDE 159:53-54. Once again, the record refutes movant's contention that her attorney did not address the lack of her signature on returns identifying her as the preparer. This claim is also meritless.

Movant also objects to the trial testimony of government witness Leonie Palmer Pascoe. Movant does not connect Ms. Pascoe's testimony to any claim of deficient performance by

---

6 The returns in movant's case were filed electronically. IRS witness Morgan responded to counsel's question with the answer that electronically filed returns do not contain handwritten signatures. DE 159:152. Instead, the PTIN functions as a signature for electronically filed returns. DE 159:103. Movant's premise that the absence of a handwritten signature provides vindication is faulty.

counsel.   Instead, movant appears to argue that the testimony of Pascoe, a personal banker who processed account opening requests for accounts connected to the charged offenses, was suspect. Movant claims that Pascoe dated codefendant Exavier and committed fraud by opening accounts in movant's name without movant's knowledge or consent.   DE 1:15.

Movant does not claim that the prosecution suppressed impeaching evidence concerning Pascoe, and there is no basis for such a claim.[7]   Since movant challenged the sufficiency of the evidence for conviction in her direct appeal, she cannot use her collateral attack to relitigate the sufficiency of that evidence.   *United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000), *cert. denied,* 531 U.S. 1131 (2001).   A claim on merits that the quality of Pascoe's testimony somehow made the government's evidence insufficient cannot support relief and is not available under § 2255 in this case.

Movant does not identify any part of the record or other evidence to support her conclusion that Pascoe allowed accounts to be opened in movant's name without her knowledge or consent. Pascoe did testify that she allowed codefendant Exavier, for some but not all accounts, to take a few signature cards from the bank for movant to sign, doing so because Exavier was a well-known and trusted customer at the time.   Whatever conclusions can be drawn from such testimony, it was elicited   on   direct   examination   by   the   prosecution,   CRDE   163:29-30,   and   also   on cross-examination by counsel for movant, *id*. at 37, 41.   Movant does not show or appear to explain how her counsel performed deficiently or caused prejudice with respect to Pascoe.   Even if characterized as a deficient performance claim, Pascoe's testimony does not provide a basis for relief.

---

7 The trial court sustained codefendant Exavier's objection to testimony that Pascoe had a personal or intimate relationship with Exavier.   CRDE 162:157-59;  163:47-48.

Movant unfairly criticizes her attorney for failing to present evidence that movant did not engage in online banking.  The source for such evidence, however, was movant herself.  CRDE 168:98 (during her sentencing hearing, movant herself testified that in 2011, she did not utilize online banking).  At trial, however, movant made a knowing, voluntary and informed decision not to testify, as reflected in a colloquy with the trial judge.  CRDE 166:67-74.  During her colloquy, which occurred after movant was placed under oath, movant confirmed that she did not wish to testify.  Additionally, she acknowledged that she was satisfied with her attorney in the way that he had represented her throughout the trial.  CRDE 166:71.[8]  The decision not to testify was movant's alone.  She does not and cannot explain how her attorney performed deficiently at trial because she exercised her right not to testify to the evidence she now complains is absent.  The record from movant's case again contradicts her claim.[9]

II.  Movant Received Effective Assistance On Appeal

Movant also maintains that the same attorney who represented her during trial provided ineffective assistance in connection with her appeal.  With respect to such claims, it is well established that appellate counsel is not required to raise all non-frivolous issues on appeal.  *Payne v. United States*, 566 F.3d 1276, 1277 (11th Cir. 2009)(citing *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983)).  It is "difficult for a defendant to show his counsel was ineffective for failing to raise certain issues on appeal, particularly if counsel did present other strong issues."  *Id.*

---

8 Such a sworn statement should be subject to a strong presumption that it is true.  *See, e.g.*, *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977); *United States v. Medlock*, 12 F.3d 185, 187 (11th Cir. 1994); *United States v. Niles*, 565 F. App'x 828 (11th Cir. 2014); *United States v. Gonzalez-Mercado*, 808 F.2d 796, 800 n. 8 (11th Cir. 1987)(strong presumption that statements made during plea colloquy are true).
9 Movant's repeatedly inaccurate representations of her trial provide a reason to question her accuracy overall and with respect to her claims about plea bargaining.

15

Moreover, "[e]xperienced advocates have emphasized the importance of winnowing out weaker arguments on appeal." 463 U.S. at 751-52.

Movant complains that her attorney did not object to the consolidation of her case on appeal with the appeal of her codefendant, Maurice Exavier.   She also objects that counsel did not make specific arguments that she instructed him to raise.

Movant makes only a perfunctory objection concerning the consolidation of appeals.   Her petition does not explain why it would have been appropriate for counsel to object, and does not demonstrate that any such objection would have been granted if it had been made.   Movant fails to explain how consolidation caused any harm to her chances of prevailing on appeal.   Because she fails to indicate any prejudice whatsoever from consolidation, movant's claim must fail. Additionally, whether or not to agree to consolidate appeals by codefendants is the type of strategic decision to which reviewing courts afford great deference, and movant does not even suggest a reason why such deference should be withheld in the instant case.

Movant contends, as with her objections to counsel's trial performance, that he failed to assert the absence of evidence connecting her to fraudulently filed tax returns or to the scheme to defraud. This contention is also inconsistent with the record.   Movant's counsel submitted a brief on appeal that challenged the sufficiency of the prosecution's evidence.   2017 WL 1406661 at *6, 10, 14-15.   That brief stated, "the evidence that was presented was filled with lack of evidence connecting the Appellant to any of the activity complained of by the Prosecution, to wit, no evidence that the Appellant knew the acquitted co-defendant no evidence that the Appellant signed any fraudulent check, tax return or that she was involved in the setting up of the systems or entity used to commit the fraud."   *Id*. at 14.   Such language encompasses the same claims that movant argues her lawyer failed to make, namely, that she was not sufficiently connected to the fraudulent

returns or to any "system or entity" used to commit the fraud (such as, for example, a bank account receiving proceeds from the scheme).   Whether or not counsel used the precise language movant wanted him to employ, the court of appeals was clearly aware of the challenges movant wished to make, even if it determined her challenges did not warrant reversal of her conviction.   Thus, the opinion on appeal addresses movant's claims, noting:

> Through counsel, she suggested that someone had forged her signature, established bank accounts in her name, and used her PTIN without her knowledge.

783 Fed. Appx. At 855.   The court of appeals was clearly cognizant of movant's claims; thus, she fails to show deficient performance or any resulting prejudice.

Movant faults her lawyer because he did not include arguments in her appellate brief that trial evidence was insufficient to convict because of evidence that movant did not engage in online banking.   DE 1:17.   Counsel could not make such an argument, however, because that evidence was not introduced during and was not part of the record for movant's trial, as a result of movant's own decision not to testify.   Thus, this objection also fails to show deficient performance.

Movant also claims that the prosecution withheld evidence consisting of records for her personal bank accounts that would purportedly show no proceeds from the fraud went into movant's accounts.   The United States rejects any claim that it withheld exculpatory evidence. Indeed, the accounts movant references were her *own* accounts, which she would have had access to (and would have known of) more readily than anyone.[10]   *See, e.g., Felker v. Thomas,* 52 F.3d 907, 910 (11th Cir. 1995) ("[T]there is no suppression, and thus no Brady violation if either the defendant or his attorney knows before trial of the allegedly exculpatory information.").   Movant

___

[10] Inexplicably, movant claims the prosecution withheld records from 2002-2012, DE 1:17, although the fraud offenses charged occurred from September, 2010 until July, 2011.   CRDE 3:3, 5, 8-11.

apparently had knowledge by the time of her sentencing that her own accounts received no deposits of fraud proceeds, because she testified accordingly. CRDE 168:104. At her sentencing, movant testified inconsistently that the government did not produce records for her personal account, CRDE 168:69, and that she saw records for her personal account in discovery from the United States. CRDE 168:106.

If movant's argument is that her attorney should have included a description of her personal accounts in her appeal, her claim must still fail. Under movant's current theory, she fails to explain how her attorney would be responsible for addressing evidence that was supposedly "withheld." Otherwise, evidence from trial reflected that movant received cash withdrawals from an account receiving fraud proceeds. *E.g.*, GX 54 (withdrawal slip for BFS account with movant's handwriting); GX 55 (containing checks payable to movant).[11] There is no reason to assume that cash would have been placed in a personal account or that cash could even be traced. Moreover, the absence of proceeds (whether cash or check) in any particular account is not inconsistent with movant's receipt of fraud proceeds, which did not have to be deposited in a personal account as opposed to some other account. Movant fails to explain the significance of any argument her attorney may have failed to make, or how the absence of any such argument resulted in prejudice on appeal. Her undeveloped contentions about counsel's choice of argument and performance on appeal fail to warrant relief.

<u>CONCLUSION</u>

For all of the foregoing reasons, this Court should deny movant's petition to vacate, set aside or correct her sentence. The record refutes the majority of movant's factual assertions.

---

11 These exhibits and others like them are described in the transcript of movant's sentencing hearing. CRDE 168:10-13, 15-33.

Movant also fails to allege a sufficient basis for relief, and does not present claims that indicate how she would have been prejudiced by counsel's performance.  Her claims do not warrant a hearing or any other relief.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By:   s/ Karen E. Rochlin
KAREN E. ROCHLIN
ASSISTANT U.S. ATTORNEY
99 N.E. 4th Street
Miami, Florida    33132
(305) 961-9234
Court I.D. No. A5500050
karen.rochlin@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by CM/ECF and by mail on Carline Maurice, 12700-104, FCC Coleman, P.O. Box 1027, Coleman, Florida    33521.

s/ Karen E. Rochlin