**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Case No. 20-cv-61386-BLOOM**

CARLINE MAURICE,

      Petitioner,

v.

UNITED STATES OF AMERICA,

      Respondent.

_____/

## ORDER ON MOTION TO VACATE SENTENCE

**THIS CAUSE** is before the Court upon Petitioner Carline Maurice's ("Petitioner") Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. ECF No. [1] ("Motion"). The Government filed a Response to the Motion, ECF No. [6] ("Response"), with supporting exhibits, ECF Nos. [6-1]-[6-12]. Petitioner filed a Reply. ECF No. [12] ("Reply"). The Court has carefully considered the Motion, all opposing and supporting submissions, the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, the Motion is denied.

### I.  BACKGROUND

Petitioner, who is presently incarcerated at the Coleman Federal Correctional Complex, asks the Court to vacate, set aside, or correct her sentence. *See generally* ECF No. [1]. The Court construes Petitioner's Motion liberally due to her *pro se* status. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

On January 7, 2017, the Grand Jury returned an Indictment charging Petitioner and her two Co-Defendants, Maurice Exavier and Jimmy Alexandre, with 22 separate counts. CR-ECF No.

[3].[1] Petitioner was charged with conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343 and 1349 (Count 1), conspiracy to commit identity fraud in violation of 18 U.S.C. §§ 1028(f) and 1028(a)(7) (Count 2), 15 counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts 3-17), and 5 counts of aggravated identity theft under 18 U.S.C. § 1028A (Counts 18-22). *Id.* at 1-11.

*The Offense Conduct and Trial.* The Eleventh Circuit previously summarized the background offense conduct and trial as follows:

> Exavier and Maurice were principals of Broward Financial Services, LLC ("BFS"), Advance Tax and Accounting Services, Inc. ("ATAS"), and Advance Tax and Accounting Services 2 ("ATAS2"). All three companies provided tax preparation services. Alexandre worked as a tax preparer for a separate business called "Mr. Cash and Associates" ("Mr. Cash"). The government alleges that through these businesses, defendants arranged to file false tax returns on behalf of deceased individuals and have refund checks deposited into bank accounts that Exavier and Maurice controlled.

> To facilitate electronic filing, the Internal Revenue Service ("IRS") assigns individual tax preparers a Preparer Tax Identification Number ("PTIN"). Similarly, the IRS assigns tax preparation businesses an Electronic Filing Identification Number ("EFIN"). Both the EFIN and PTIN are specific to that business or individual, and cannot be transferred or reassigned. When a tax preparation business files an electronic return, it must include both the EFIN for the business and the PTIN for the individual tax preparer.

> In 2003, the IRS issued an EFIN to BFS. In March of 2008, the IRS issued a PTIN to Exavier so that he could file tax returns for BFS clients. In 2009, in addition to tax preparation services, BFS obtained a state license as a money services business to offer check cashing services for tax preparation clients. The EFIN for BFS became inactive in November of 2010, and the IRS suspended its authorization to file tax returns electronically.

> In July of 2010, Exavier and Maurice established ATAS, with Maurice as president and Exavier as vice president. The IRS issued an EFIN to ATAS. On September 10, 2010, a Florida corporation called The Tax Doctors of Broward County reorganized to become ATAS2, with the same business address as ATAS. On September 30, 2010, the IRS issued an EFIN to ATAS2.

> In early 2011, ATAS electronically filed 158 income tax returns seeking $536,430 in refunds for deceased individuals. In this same period, ATAS2 electronically filed 312 returns for deceased individuals claiming $1,069,752 in

---

[1]  References to docket entries in Petitioner's criminal case, No. 16-cr-60007, are denoted as "CR-ECF No."

refunds. All of these refunds were filed under EFINs for ATAS and ATAS2 and Maurice's PTIN. Each return included the correct name, birth date, and social security number of the decedent, but listed false information regarding employment, income, contact information, tax credits, deductions, and dependents. The IRS did not actually owe refunds on any of these returns.

In transactions involving a paid tax preparer, a taxpayer can direct the IRS to deposit the refund in the bank account of a designated third party. The third party pays the tax preparer directly, then deducts a processing fee and pays the balance to the taxpayer. ATAS and ATAS2 used Santa Barbara Tax Products Group ("SBTPG") to process refunds and pay tax preparation fees. SBTPG sent blank checks to ATAS and ATAS2 and when it received refunds from the IRS, authorized them to print cashier's checks for the taxpayers. The government claimed that defendants used this arrangement so that Maurice and Exavier could deposit refund checks for deceased individuals into accounts which they controlled.

On January 19, 2011, after reviewing nine tax returns that had been filed for deceased individuals under the ATAS EFIN, SBTPG terminated its relationship with ATAS. Other than a few refund checks that issued before it discovered the fraud, SBTPG did not actually issue refunds for the fraudulent returns that ATAS and ATAS2 had filed. SBTPG did deposit tax preparation fees into their bank accounts, however, with ATAS receiving approximately $54,457 and ATAS2 receiving $245,569. Of the $54,457 which ATAS received, $4,000 was traced to Maurice and $2,000 to Exavier, with the balance largely used to pay "1099 commissions" to various unspecified individuals. Of the $245,569 which ATAS2 received, $10,000 was transferred to Maurice through checks, $59,000 was transferred to Exavier through checks, $5,000 was transferred to a BFS bank account, and nine checks totaling $20,350 were made payable to cash. The balance apparently remained in the ATAS2 account or was not directly traceable to defendants.

Alexandre worked as a tax preparer for Mr. Cash in early 2011. He received permission from the company's owner, Yanel Laroche, to file electronic tax returns for his "friends," *i.e.*, tax preparers who had lost their EFINs but who nevertheless wished to service some 1,000 clients. Between January 28 and March 3, 2011, Alexandre filed 363 tax returns electronically under Mr. Cash's EFIN and his own PTIN. Of those 363 tax returns, 345 sought refunds amounting to $1,708,910 in the names of deceased individuals. Like the fraudulent returns which ATAS and ATAS2 filed, Alexandre's returns contained the correct names, birth dates, and social security numbers of the decedents, but listed false information regarding employment, income, contact information, tax credits, deductions, and dependents. For Alexandre's returns, Mr. Cash used SBTPG to process refunds and pay tax preparation fees. In March of 2011, SBTPG contacted Laroche to alert him that tax returns had been filed for "dead people" under Mr. Cash's EFIN. Laroche discovered that Alexandre had prepared all of those tax returns. When SBTPG detected the fraud, it had already authorized checks for many of the refunds claimed in those returns. Among them, SBTPG had authorized $555,939 in refunds on 161

checks that were printed in the Mr. Cash office and deposited into a BFS business checking account that listed Exavier and Maurice as authorized signatories. Alexandre, who did not have a physical office at Mr. Cash, was the only individual who had picked up refund checks that SBTPG issued for the fraudulent returns. SBTPG paid $965,585 in refunds that the IRS funded for the 345 fraudulent tax returns that Alexandre prepared in early 2011.

Approximately 97 percent of the checks deposited into the BFS business checking account in the first quarter of 2011 were tax refund checks. At trial, IRS Special Agent Bradley Cohen testified that in addition to the 161 refund checks related to Alexandre's returns, BFS deposits included 491 refund checks totaling $1,785,683 from returns filed by tax preparers other than defendants, ATAS, ATAS2, or Mr. Cash. Of this amount, $639,610 was transferred to another BFS account which listed Maurice and Exavier as signatories. From that account, checks totaling $57,250 were paid to Maurice, $40,500 to Exavier, $19,000 to Exavier's wife, $4,000 to ATAS, and $360,298 to cash. Of the checks made payable to cash, $28,000 was traced to a joint account that belonged to Exavier and his wife. Agent Cohen did not opine on the legitimacy of all of the refund checks from other tax preparers, but he analyzed 100 of the 491 refunds. He found that more than 60 of the refund checks were for deceased individuals and that 18 of them were for incarcerated individuals, two of whom were serving life terms.

Agent Cohen testified that documents from the Office of Financial Regulation had listed BFS as a check cashing and money transmitter business. Agent Cohen testified that in November of 2009, when Exavier applied for a Florida business license, he represented that his check cashing operation was limited to cashing checks for tax clients. Agent Cohen testified that in February of 2012, when he went to visit the principal place of business which BFS listed on its annual report, he did not see any sign which represented that check cashing services were offered there. Agent Cohen testified that from 2010 through 2016, BFS moved several times to and from the most recent address on record with the State of Florida (2033 University Drive, Sunrise, Florida) and where ATAS and ATAS2 were located (930 and 938 N.E. 62 Street, Oakland Park, Florida).

Agent Cohen further testified that some checks on the bank account of Exavier and his wife had been made payable to "Antonio Duval." Other checks drawn on a BFS account were payable to the same individual. Agent Cohen never investigated Duval and did not know how much cash he received from Exavier. Exavier did not testify at trial. Through counsel, he maintained that he had a legitimate check cashing operation and that perhaps a teller, Duval, or someone else had cooperated with Alexandre in the fraudulent scheme. Exavier's counsel argued that the government's investigation was incomplete because it did not sufficiently investigate the signatures on various documents, the actual sender or recipient of various email communications, or the unidentified recipients of large amounts of money from refund checks and tax preparation fees.

Maurice also did not testify. Through counsel, she suggested that someone

had forged her signature, established bank accounts in her name, and used her PTIN without her knowledge. A handwriting expert testified that "she didn't write the signature on certain of the documents that were submitted" and that as to other documents, his findings were "inconclusive." The expert eliminated Maurice as the signatory on three documents, including two checks, but he could not eliminate her as the person who signed the remaining documents.

At trial, Alexandre testified that he had met a man named "Crazy C," who told him that he and his partners had a tax return preparation business with more than 1,000 clients, but that the business had lost its EFIN. In return for part of the tax preparation fees, Crazy C gave Alexandre information on his clients so that Alexandre could prepare their tax returns for 2010. Alexandre testified that Laroche gave him permission to file the returns through Mr. Cash. Alexandre accepted tax return files from Crazy C and filed the returns electronically under Mr. Cash's EFIN. Alexandre claimed that when he accepted tax returns from Crazy C, he did not know they were for deceased individuals. Alexandre testified that he had no intent to defraud anyone and that he had not conspired with Exavier or Maurice to file fraudulent tax returns. Alexandre testified that he had no idea how tax refund checks ended up in BFS bank accounts because he had simply picked up the checks at Mr. Cash's offices and given them to Crazy C.

*United States v. Exavier*, 783 F. App'x 849, 852-55 (11th Cir. 2019). On July 26, 2016, at the conclusion of the 10-day trial, the jury found Petitioner and her Co-Defendant Exavier guilty as charged on all twenty-two counts. CR-ECF No. [167] at 55-57. Alexandre was acquitted on all counts. *Id.* at 57-58. Petitioner was sentenced to a total of 132 months imprisonment, 108 months as to each of Counts 1 through 17, to be served concurrently, and 24 months as to each of Counts 18 through 22, to be served concurrently with each other and consecutively to Counts 1 through 17. CR-ECF No. [136] at 2.

***Appeal and Post-conviction Proceedings***. Petitioner was represented by the same counsel for her direct appeal. Through counsel, Petitioner timely filed an appeal. Upon the Government's unopposed motion, the Eleventh Circuit ordered Petitioner's and Exavier's appeals to be consolidated. *See United States v. Exavier*, 783 F. App'x 849, 852 (11th Cir. 2019). Petitioner raised three arguments: (1) the evidence was insufficient to support her conviction; (2) a new trial was warranted because the Government failed to disclose certain information and presented false

testimony; and (3) the district court erred when it refused to sever her trial from Exavier's trial. *Id.* The first two arguments were raised jointly, but Petitioner raised the third argument individually. *Id.* On July 30, 2019, the Eleventh Circuit issued a written opinion affirming the convictions. *Id.* at 868.

*The § 2255 Proceedings*. On June 23, 2020,[2] Petitioner filed her Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. *See* ECF No. [1]. The Government filed a Response, ECF No. [6], and exhibits arguing that the Petitioner was not entitled to relief, ECF Nos. [6-1]-[6-12]. The Response did not dispute that the Motion was timely nor did it contend that procedural bars existed. ECF No. [6] at 7.

Following review of the Response, Magistrate Judge Reid issued a Supplemental Order to Show Cause to both parties. ECF No. [9]. The Government filed a Supplemental Response, ECF No. [11] ("Supp. Response"), and supporting exhibits, ECF Nos. [11-1]-[11-2]. Petitioner filed responsive affidavits. ECF Nos. [13]-[14]. On December 15, 2020, based on the filings, the District Court ordered the Government to file a second supplemental response. ECF No. [15]. In compliance, the Government filed its Supplemental Response to December 15, 2020 Order, ECF No. [16], and attached exhibits, ECF Nos. [16-1]-[16-2].

## II. LEGAL STANDARD

*Section 2255 Motions*. "A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution . . . may move the court which imposed the sentence to vacate, set aside, or correct the sentence." 28 U.S.C. § 2255(a) (alteration added). Because collateral review

---

[2] "Under the prison mailbox rule, a *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing." *Williams v. McNeil*, 557 F.3d 1287, 1290 n.2 (11th Cir. 2009) (citations and internal quotation marks omitted).

is not a substitute for direct appeal, the grounds for collateral attack on final judgments under § 2255 are extremely limited. *See United States v. Frady*, 456 U.S. 152, 165 (1982). A prisoner is entitled to relief under § 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States; (2) exceeded its jurisdiction; (3) exceeded the maximum sentence authorized by law; or (4) is otherwise subject to collateral attack. *See* 28 U.S.C. § 2255(a); *see also McKay v. United States*, 657 F.3d 1190, 1194 n.8 (11th Cir. 2011) (citation omitted). "[R]elief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice." *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004) (quoting *Richards v. United States*, 837 F.2d 965, 966 (11th Cir. 1988)).

*Ineffective Assistance of Counsel*. To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both (1) that counsel's performance was deficient, and (2) a reasonable probability that the deficient performance prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984) ("*Strickland*"); *see also Harrington v. Richter*, 562 U.S. 86, 104 (2011). To satisfy the prejudice prong, a petitioner must establish that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *See Strickland*, 466 U.S. at 694; *see also Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993); *Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 754 (11th Cir. 2010). If a petitioner fails to establish one of the prongs under *Strickland*, the Court need not address the remaining prong. *See Strickland*, 466 U.S. at 697.

A petitioner bears the burden of proof in habeas proceedings. *See Blankenship v. Hall*, 542 F.3d 1253, 1270 (11th Cir. 2008). "'There is a strong presumption that counsel's performance was reasonable and adequate.' To overcome that presumption, 'a petitioner must establish that no competent counsel would have taken the action that his counsel did take.'" *Gordon v. United*

*States*, 518 F.3d 1291, 1301 (11th Cir. 2008) (quoting *Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005); *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000)).

***Ineffective Assistance of Appellate Counsel***. *Strickland* "governs a claim of ineffective assistance of appellate counsel." *Overstreet v. Warden*, 811 F.3d 1283, 1287 (11th Cir. 2016) (citation omitted). "Under *Strickland*, a petitioner must show (1) his attorney's performance was deficient, and (2) the deficient performance prejudiced the petitioner's defense." *Id.* (citing *Strickland*, 466 U.S. at 687).

"Appellate counsel has no duty to raise every non-frivolous issue and may reasonably weed out weaker (albeit meritorious) arguments." *Id.* (citation omitted). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Id.* (quoting *Smith v. Robbins*, 528 U.S. 259, 288 (2000)); *see also Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017) ("Declining to raise a claim on appeal . . . is not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court." (citation omitted)). "In most cases, an unpreserved trial error will not be a plainly stronger ground for appeal than preserved errors." *Davis*, 137 S. Ct. at 2067.

"A petitioner satisfies the prejudice prong upon showing that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [appeal] would have been different.'" *Overstreet*, 811 F.3d at 1287 (quoting *Strickland*, 466 U.S. at 694); *see also Ferrell v. Hall*, 640 F.3d 1199, 1236 (11th Cir. 2011) (stating that to prove prejudice, petitioner alleging appellate ineffectiveness must show that "the outcome of the appeal would have been different" (citations omitted)).

## III.   DISCUSSION

The Motion raises three claims of ineffective assistance of counsel and ineffective assistance of appellate counsel. ECF No. [1]. In Claim One, Petitioner alleges that counsel was

ineffective for failing to communicate a plea offer. *Id.* at 14. In Claim Two, Petitioner raises three subclaims pertaining to ineffective assistance of counsel during the trial. *Id.* at 14-15. In Claim Three, Petitioner raises two subclaims pertaining to ineffective assistance of appellate counsel. *Id.* at 16-18. Petitioner was represented by the same counsel at trial and on appeal. The Court turns to each claim and subclaim in turn.

### A. Claim One

In Claim One, Petitioner alleges that counsel was ineffective for failing to communicate the Government's plea offer. ECF No. [1] at 14. Petitioner contends that on August 29, 2019, during a legal telephone call with counsel following the denial of her direct appeal, he said to her, "Carline, you should have taken the deal." *Id.* Petitioner replied, "What deal?" *Id.* Counsel then stated that he would send her documentation "to refresh her memory." *Id.*; ECF No. [13] at 1. At all times relevant, Petitioner states that she never received any documentation regarding a plea offer nor did counsel ever inform her, prior to the August 29, 2019 telephone call, that the Government extended any plea offers. *Id.*

The Government filed two supplemental responses stating the following: (1) a "proffer session" was held with Petitioner, counsel, the prosecutor, and special agents from the IRS, ECF No. [16] at ¶ 1; (2) the "proffer session" was not productive, *id.*; and (3) no plea was ever extended to Petitioner, ECF No. [11] at ¶ 2. The Government submitted the signed "proffer letter," ECF No. [11-1], and a July 7, 2016 email from the prosecutor to counsel regarding "informal discussions" regarding applicable sentencing guidelines, ECF No. [11-2]. The Government avers that counsel never emailed a reply to the July 7, 2016 message. ECF No. [16] at ¶ 2.

Petitioner requested that the Bureau of Prison ("BOP") provide her with a copy of the telephone conversation as well as copies of emails exchanged between her and counsel from January 2019 through January 2020. ECF No. [13] at 1; ECF No. [14] at 2. The BOP informed

Petitioner that the actual emails had been purged but provided her with a log of emails sent to and from counsel. ECF No. [14] at 2-3. The log showed a chain of emails with the subject matter "Docs" exchanged between Petitioner and counsel in September 2019; importantly, the log shows that counsel replied twice, including the last response in the email chain. *Id.* at 3. Petitioner did not receive a response to her inquiry about the telephone recording. *Id.* at 1-2.

The Government also requested records from the BOP pertaining to the August 29, 2019 telephone call. ECF No. [16] at ¶ 3. The BOP responded that it "does not record properly placed legal calls, and that calls placed on an inmate line would be purged within six months." *Id.* The BOP also produced a log of telephone calls to the facility from counsel's phone number. *Id.* at ¶ 4. The Government submitted a redacted version except for calls between counsel and Petitioner. ECF No. [16-2]. In August 2019, there are only two calls between Petitioner and counsel: (1) a three-minute call on August 6, 2019; and (2) a four-minute call on August 20, 2019. *Id.* at 4.

Ineffective assistance of counsel claims in the plea bargaining context are governed by *Strickland*. *See Missouri v. Frye*, 566 U.S. 134, 140 (2012) (citation omitted). "Under [*Strickland*'s] two-part test, a petitioner asserting a claim of ineffective assistance of counsel must demonstrate both deficient performance and prejudice—that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Gissendaner v. Seaboldt*, 735 F.3d 1311, 1317 (11th Cir. 2013) (alteration added; citations and internal quotation marks omitted). In *Frye*, the Court specifically held that counsel has a "duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused," and that, in general, where such an offer is not communicated to the defendant, counsel "[does] not render the effective assistance the Constitution requires." *Frye*, 566 U.S. at 145 (alteration added); *In re Perez*, 682 F.3d 930, 932 (11th Cir. 2012) (per curiam).

To demonstrate prejudice, a petitioner must show that, but for the ineffective assistance of counsel, a reasonable probability existed that "[she] would have accepted the lapsed plea but also a reasonable probability that the prosecution would have adhered to the agreement and that it would have been accepted by the trial court." *Id.* at 150 (alteration added).

Bare, conclusory allegations of ineffective assistance are insufficient to satisfy the *Strickland* test. *Boyd v. Comm'n, Ala. Dep't of Corr.*, 697 F.3d 1320, 1333-34 (11th Cir. 2012); *Wilson v. United States*, 962 F.2d 996, 998 (11th Cir. 1992) (per curiam). Where the petitioner does not provide credible supporting evidence and makes an unsupported factual allegation inconsistent with the record, she is not entitled to a hearing on her § 2255 petition. *Ferguson v. United States*, 699 F.2d 1071, 1072 (11th Cir. 1983), *superseded on other grounds by Martin v. United States*, 81 F.3d 1083, 1084 (11th Cir. 1996) (per curiam); *see Birt v. Montgomery*, 725 F.2d 587, 591 (11th Cir. 1984) (en banc) (establishing need for an evidentiary hearing is petitioner's burden). Furthermore, a hearing is not required on conclusory allegations unsupported by specifics. *Peoples v. Campbell*, 377 F.3d 1208, 1236-37 & n.57 (11th Cir. 2004); *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991). Even in cases where a petitioner provides affidavits in support of her § 2255 petition, affidavits that amount to nothing more than conclusory allegations do not warrant a hearing. *Lynn v. United States*, 365 F.3d 1225, 1239 (11th Cir. 2004) (per curiam).

Even construing Petitioner's allegations in the most favorable light, she is not entitled to relief. Petitioner alleges that following her conviction and its affirmance on appeal, counsel informed her for the first time of the Government's plea offer and advised she should have accepted it. ECF No. [1] at 14. The Government contends that no such plea offer was ever extended to Petitioner. ECF No. [11] at ¶ 2. The parties did confer on June 2, 2016 for a "proffer session" but it was "not productive and did not result in any offer of a plea bargain." ECF No. [16] at ¶ 1.

Additionally, any "informal discussion" between the Government and counsel did not result in any plea offer. *Id.* at ¶ 2; *see* ECF No. [11] at ¶ 3.

Assuming Petitioner's allegation that counsel told her in an August 2019 telephone call that she should have taken the plea offer is true, the record evidence forecloses any relief because it conclusively shows that the Government never extended a plea offer to Petitioner. In fact, counsel's actions after-the-fact in failing to send Petitioner documents to "refresh her memory" lends further credence to the Government's assertions—counsel could not send any plea documents because none existed. Petitioner's allegations are inconsistent with the factual record. As such, she is not entitled to relief on Claim One. *See Lynn*, 365 F.3d at 1239.[3]

## B. Claim Two

In Claim Two, Petitioner argues that counsel was ineffective for failing to raise certain objections during the trial. ECF No. [1] at 14-15.

### i.   *Counsel's failure to object to Government statement regarding PTIN secrecy*

First, Petitioner argues counsel was ineffective for failing to object to the Government's statement that "the personal tax identification number (PTIN) is as secret as a debit (PIN)." *Id.* at 14. Copies of 1040 tax returns were presented as exhibits at trial. *Id.* The name, address, and PTIN of the preparer were displayed on the front of the forms, undermining the Government's statement that the PTIN was "as secret as a debit (PIN)." *Id.*

The record refutes Petitioner's subclaim. In its opening statement, the Government argued that PTINs were "unique, individual, not shared and treated like a Social Security number." CR-ECF No. [159] at 12. The IRS intended PTINs be used for identification purposes and instructed

---

[3] Assuming *arguendo* that Petitioner's allegations regarding her counsel's performance are true, where a petitioner fails to establish that counsel's performance prejudiced her, the Court need not conduct an evidentiary hearing. *United States v. Laetividal-Gonzalez*, 939 F.2d 1455, 1465 (11th Cir. 1991), *overruling on other grounds recognized by United States v. Young*, 975 F.3d 1537, 1540 (11th Cir. 1992); *Schultz*, 701 F.2d at 901.

recipients to keep their PTIN confidential. *Id.* Counsel countered the Government's claim in his opening statement. *Id.* at 29-32. He agreed that PTINs were used for identification purposes but stated that PTINs could not be confidential because they appear on tax returns and can be "made public." *Id.* at 31. Counsel proposed that a PTIN could be "pull[ed] [] off of anywhere." *Id.* (alterations added).

Government witness Kristy Morgan, a criminal investigations witness coordinator and records custodian for the IRS, testified that "once [a PTIN is] issued, you are told to secure that PTIN just like you would a Social Security number using that only for your preparation of taxes." *Id.* at 104-05 (alterations added). She also testified that she was not aware of any source of public information for an individual's PTIN, that 1040 tax returns were not public records, and that there was no way to look up a PTIN online. *Id.* at 105-06. On cross examination, defense counsel elicited that a taxpayer could retrieve an individual's PTIN if the taxpayer requested a copy of the 1040 tax return from the IRS. *Id.* at 140-42; CR-ECF No. [160] at 32. Alternatively, an individual could obtain their preparer's PTIN if the preparer provided them with a copy of the completed electronically filed tax application. CR-ECF No. [160] at 32. Counsel pointed out that because 1,643 1040 tax returns were filed using Petitioner's PTIN that meant that at least 1,643 individual taxpayers had the ability to obtain Petitioner's PTIN. CR-ECF No. [159] at 151, 154. Finally, on cross examination, Co-Defendant Jimmy Alexandre confirmed that he never inputted his PTIN into the e-filing software, implying that the software preloaded the PTIN making the PTIN of a lesser order of confidentiality than a social security number or a PIN. CR-ECF No. [170] at 155. In his closing argument, counsel questioned the e-filing software, arguing that even if Petitioner's PTIN was used to obtain fraudulent tax returns, the Government failed to establish a direct connection to Petitioner personally attaching her PTIN. CR-ECF No. [166] at 127, 131.

Accordingly, Petitioner's subclaim that trial counsel failed to challenge the Government's assertion of secrecy and confidentiality tied to Petitioner's PTIN is contrary to the record and without merit.

### ii.     Counsel's failure to object to verification of Petitioner's signature on filed tax returns

Second, Petitioner argues that counsel was ineffective for failing to object to the verification of her signature on filed 1040 tax returns. ECF No. [1] at 15. Petitioner's signature was not on any of the filed tax returns in the space where the tax preparer would sign. *Id.* Had counsel objected, it would have proved that she was not involved in filing fraudulent tax returns and that she had no involvement in the scheme. *Id.*

Petitioner's argument is misleading but is nonetheless refuted by the record. There were 1,643 1040 tax returns in the record that were filed using Petitioner's PTIN number. CR-ECF No. [159] at 144. Of those, testimony confirmed that 99% were electronically filed. *Id.* at 146. Counsel elicited testimony that in place of the tax preparer's handwritten signature, the tax filing software for e-filing 1040 tax returns required the tax preparer's typed-written name and PTIN. *Id.* at 152.

Prior to the testimony of the first witness, the Government moved to admit exhibit number 16, a 1040 tax return for a deceased individual. CR-ECF No. [159] at 42. Counsel objected to the admission of the bottom portion of the certified record on the basis that there was "no foundation for its admission under 803 business record . . . [or] to establish the nexus under 403, 404, prejudicial." *Id.* at 43 (citing Fed. R. Evid. 403, 404, 801; alterations added). The objected to portion of the form contained Petitioner's typed-written name and PTIN. *Id.* The objection was overruled. *Id.* On cross examination, counsel highlighted that Petitioner's signature was missing from the fraudulent 1040 tax returns and that the exhibit merely showed that "someone typed

[Petitioner's] name on a piece of paper." *Id.* at 53 (alteration added). Speaking to a relative of one of the deceased victim's, trial counsel clarified:

| [Counsel]: | We all share your loss, ma'am. We do. But you don't know who typed that name on the piece of paper, do you? |
| [Witness]: | No. |
| [Counsel]: | And no one up until this moment of July 12 . . . has been able to indicate to you who created that document? |
| [Witness]: | No. |

*Id.* at 53-54 (alterations added). Trial counsel also elicited confirmation from Morgan, the IRS records custodian that reviewed the tax returns in question, that none of the returns contained Petitioner's handwritten signature. *Id.* at 152.

Accordingly, Petitioner's subclaim that trial counsel failed to challenge the verification of Petitioner's signature on filed tax returns is contrary to the record and without merit.

> iii. *Counsel's failure to impeach testimony of Government witness Leonie Palmer Pascoe based on her romantic relationship with co-defendant Exavier*

Petitioner's third argument is less clear. Petitioner appears to argue that counsel was ineffective for not impeaching the testimony of Government witness Leonie Palmer Pascoe based upon her romantic relationship with Co-Defendant Maurice Exavier. ECF No. [1] at 15. In support, Petitioner incorrectly states that Pascoe testified at trial that she was dating Exavier. *Id.* In her Reply, Petitioner clarifies that the Government attempted to introduce testimony about Pascoe's romantic relationship with Exavier, but the District Court sustained Exavier's objection. ECF No. [12] at 4; *see* CR-ECF No. [162] at 157-59; CR-ECF No. [163] at 47-48. Petitioner states that the "jury was never made aware of [Pascoe's] loyalty and conflict of interest to Mr. Exavier. Counsel was aware of this and did not argue this." *Id.* (alteration added). Petitioner now argues that Pascoe fraudulently opened online bank accounts in Petitioner's name without her consent. *Id.* Petitioner

states that the Government's discovery showed that "the online accounts were managed by Co-Defendant Exavier through his email account and not by Petitioner Maurice." ECF No. [1] at 15. Petitioner avers that she is "actually innocent" and counsel "should have questioned Ms. Pascoe more intently to reveal her reasoning for her loyalty and breaking the bank's policy for Mr. Exavier." ECF No. [12] at 4. Petitioner avers that Pascoe's unimpeached testimony contributed to Petitioner's conviction. *Id.*

Petitioner cannot meet her burden to establish that counsel's performance was deficient. First, on direct, the Government elicited, and the jury heard, the following from Pascoe: that she was Exavier's personal banker, CR-ECF No. [162] at 157; that she saw him "frequently," *id.* at 164; that she saw him at the bank and at the BFS office, *id.*; that after her home went into foreclosure, Exavier helped Pascoe with the short sale of her mortgage, *id.* at 164-65, *see* CR-ECF No. [163] at 24; that Exavier prepared Pascoe's taxes at the BFS office, *id.* at 170; that when Pasco visited the BFS office to have her taxes prepared, she saw Petitioner sitting at a desk in the office, *id.* at 170, *see* CR-ECF No. [163] at 31; that Pascoe and Exavier exchanged email messages, *id.* at 165; that Pascoe was familiar with Exavier's handwriting and recognized his signature, *id.* at 168; that Bank of America's policy for opening accounts and assigning signature authority required the customer to present identification and sign signature cards at the bank in the presence of the personal banker, CR-ECF No. [163] at 27-28; that for the opening of one of Petitioner's and Exavier's business accounts, both came into the bank to sign in her presence, *id.* at 29; and that based on her relationship with Exavier as a "well-known customer," Pascoe "felt comfortable giving [Exavier] the signature cards to have [Petitioner] sign and return" them to her in violation of bank policy, *id.* at 29-31 (alterations added).

On cross examination, counsel *again* elicited testimony from Pascoe that she had not actually witnessed Petitioner sign the signature cards for the BFS business account:

| [Counsel]: | When these signature cards were created by your own handwriting, was this young lad[y] standing or sitting in front of you, yes or no? |
|---|---|
| [Witness]: | No. |
| [Counsel]: | Did you ever call her up and confirm whether or not that was actually something she wanted to do, yes or no? |
| [Witness]: | No. |
| | . . . |
| [Counsel]: | Under penalties of perjury, I certify that what's contained in this document is true, isn't that what the document says? |
| [Witness]: | Yes. |

CR-ECF No. [163] at 41-42 (alterations added). Based on the testimony elicited from Pascoe at trial, Petitioner has not met her burden of proof that trial counsel performed deficiently.

Moreover, the Government twice requested to ask Pascoe about her intimate relationship with Exavier in order to explain "why she was able to give [him] special treatment . . . [and] certain aspects of what she knows and why she knows it." CR-ECF No. [162] at 158 (Direct Examination); *see* CR-ECF No. [163] at 47 (Re-direct Examination). In both instances, Exavier's counsel objected that introducing the intimate relationship constituted Rule 404(b) evidence and was more prejudicial than probative under Rule 403 of the Federal Rules of Evidence. *Id.* at 159; CR-ECF No. [163] at 48. The District Court sustained both objections. *Id.*; CR-ECF No. [163] at 48. Counsel's failure to raise a similar objection was not deficient performance because counsel could have reasonably concluded that any further argument in support of admission of the testimony had "dismal prospects for success." *Knowles v. Mirzayance*, 556 U.S. 11, 127 (2009); *see Pinkney v, Sec'y, Dep't of Corr.*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to

have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").

Furthermore, Petitioner did not suffer prejudice. Due to the Government's attempts to introduce the testimony, the District Court had two opportunities to consider the substance of Petitioner's instant claim and rejected it both times. Although the jury did not hear testimony regarding the intimate relationship between Pascoe and Exavier, they did hear testimony that Pascoe had an extensive business relationship with Exavier that extended to her own personal financial affairs. The jury also heard testimony that based upon her familiarity with Exavier, Pascoe violated bank policy requiring in-person signatures and did not personally witness Petitioner sign authorizing documents for business accounts she shared with Exavier. Accordingly, Petitioner cannot show that but for counsel's failure to question Pascoe on her intimate relationship with Exavier, the outcome of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. Petitioner is not entitled to relief on this subclaim.

### C. Claim Three

In Claim Three, Petitioner argues she was denied effective assistance of appellate counsel. Petitioner raises several different arguments in support of Claim Three. She argues that, without consulting her, counsel agreed to the consolidation of Petitioner's and Exavier's direct appeals. ECF No. [1] at 16. Additionally, Petitioner argues counsel was ineffective for failing to file an addendum to her appellate brief. *Id.*

   i.   *Ineffective assistance of appellate counsel for agreeing to the consolidation of Petitioner's direct appeal with her co-defendant Exavier*

Petitioner argues that counsel was ineffective for agreeing to consolidate her direct appeal with Co-Defendant Exavier. ECF No. [1] at 17. In the October 26, 2017 letter, Petitioner states that she did not agree for the appeals to be consolidated. In her Reply, Petitioner asserts that "[t]he

Government had made the assumption that Ms. Maurice's brief and Mr. Exavier's brief would r[a]ise the same or similar issues." ECF No. [12] at 4 (alterations added). Petitioner also states that on several occasions during the trial there was confusion when the Government referred to her full name due to the similarity with Co-Defendant Exavier's full name. *Id.*

Petitioner's subclaim is conclusory and refuted by the record. Although the appeals were consolidated, Petitioner was still able to raise additional claims independent of Exavier. *See United States v. Exavier*, 783 F. App'x 849, 852 (11th Cir. 2019) ("On appeal, Exavier and Maurice argue that (1) the evidence was insufficient to support their convictions and (2) a new trial is warranted because the government failed to disclose certain information and presented false testimony. . . . Maurice individually argues that the district court erred when it refused to sever her trial from Exavier's trial."). Additionally, Petitioner does not explain how instances of confusion between her name and Exavier's name during the trial supports her contention that she was prejudiced when their appeals were consolidated. Petitioner's subclaim is without merit.

> ii.   *Ineffective assistance of appellate counsel for failing to file addendum to appellate brief*

Petitioner argues that counsel was ineffective for failing to file an addendum to her appellate brief. ECF No. [1] at 16-18. Counsel filed Petitioner's appellant brief on April 17, 2017. *United States v. Maurice*, No. 16-17009 (11th Cir. filed Nov. 7, 2016) (docket entry dated Apr. 17, 2017), *consolidated with United States v. Exavier*, 783 F. App'x 849 (11th Cir. 2019).[4] Petitioner's letter to counsel is dated October 26, 2017, more than six months after the appellant brief was initially filed, and contains the following issues Petitioner wanted counsel to file in an addendum to the appellate brief: (1) the Government failed to disclose information to the Court

---

[4] On June 2, 2017, a corrected appellate brief was filed rectifying deficiencies but noting the service date as April 17, 2017. *Maurice*, No. 16-17009 (docket entry dated June 2, 2017).

about subpoenas of Petitioner's personal bank records from 2002-2012, which would have shown that no funds from the fraudulent scheme were ever deposited into her account; (2) unlike both Co-Defendants, Petitioner's signature was not on any of the 8879 forms on the filed tax returns; (3) Co-Defendant Exavier opened and managed bank accounts in Petitioner's name and only he had online access to the accounts through his email address; (4) no witnesses identified Petitioner as the person that filed their taxes or the taxes of "their loved ones." ECF No. [1] at 16-17. The letter referenced a two-page motion that Petitioner was "considering sending to the court." *Id.* at 18. But, Petitioner conceded, she was sending the motion first to counsel to submit on her behalf. *Id.* Petitioner wrote that should counsel disagree with filing the motion, he should reply to her by November 14, 2017 with "legal reason(s)" not to submit the motion in order for Petitioner to "make other arrangemen[ts]." *Id.* at 18 (alterations added). The referenced motion was not included as an attachment to the Motion.

Petitioner's subclaim is without merit. First, Petitioner argues that counsel should have argued on appeal that the Government "withheld information from the Court and the jury about the subpoenas of [her] personal bank records from 2002-2012, which proved no funds of such scheme was ever deposited in [her] account." *Id.* at 17 (alterations added). Petitioner's arguments are merely conclusory. Petitioner does not provide the alleged withheld bank records, nor does she explain how simultaneously the Government withheld the records *and* counsel was aware of this and failed to raise the issue on appeal. Most importantly, Petitioner's claim must fail because the facts allegedly withheld were within her personal knowledge. The Eleventh Circuit has "held numerous times that there is no suppression, and thus no *Brady* violation, if either the defendant or his attorney knows before trial of the allegedly exculpatory information." *Felker v. Thomas*, 52 F.3d 907, 910 (11th Cir. 1995).

Next, the record refutes Petitioner's remaining arguments. Several of the issues raised in the letter involve the sufficiency of evidence to convict Petitioner. *Id.* at 17. In a renewed motion for judgment of acquittal at trial, counsel unsuccessfully argued that aside from her PTIN, Petitioner's signature was not on any of the tax returns in question, nor did any witnesses testify that Petitioner prepared their tax returns or the tax returns of a loved one. CR-ECF No. [166] at 62-64. On appeal, counsel again raised the issue of insufficiency of the evidence, arguing that the District Court abused its discretion when it denied counsel's motion for judgment of acquittal. *Maurice*, No. 16-17009, 2017 WL 1406661 (Appellant Brief); *see Exavier*, 783 F. App'x at 852. In the appellate brief, counsel argued that there was "no evidence that [Petitioner] knew the acquitted co-defendant, no evidence that [Petitioner] signed any fraudulent check, tax return or that she was involved in the setting up of the systems or entity used to commit the fraud." *Id.* at 14 (alterations added). Thus, counsel was not required to raise every non-frivolous issue on appeal, particularly where those issues were not "clearly stronger" than those raised in the brief. *See Overstreet*, 811 F.3d at 1287; *see also Davila*, 137 S. Ct. at 2067. Petitioner has failed to demonstrate that counsel performed deficiently.

Furthermore, it is clear from its opinion that the Eleventh Circuit was cognizant of the additional reasons Petitioner raised in her letter in support of the insufficiency claim. *See Exavier*, 783 F. App'x at 855 ("Through counsel, she suggested that someone had forged her signature, established bank accounts in her name, and used her PTIN without her knowledge."). The Eleventh Circuit found that "the district court did not err in overruling defendants' motions for judgment of acquittal." *Exavier*, 783 F. App'x at 857. Thus, Petitioner cannot show prejudice and is not entitled to relief.

## IV.  EVIDENTIARY HEARING

In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing. *See Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1060 (11th Cir. 2011). "[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007); *see also Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1318-19 (11th Cir. 2016). Here, the issues presented can be resolved based on the record before the Court. Indeed, because the Court can "adequately assess [Petitioner's] claim[s] without further factual development[,]" Petitioner is not entitled to an evidentiary hearing. *Turner v. Crosby*, 339 F.3d 1247, 1275 (11th Cir. 2003).

## V.  CERTIFICATE OF APPEALABILITY

A prisoner seeking to appeal a district court's final order denying his or her petition for writ of habeas corpus has no absolute entitlement to appeal; rather, in order to do so, she must obtain a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1); *see also Harbison v. Bell*, 556 U.S. 180, 183 (2009). This Court should issue a certificate of appealability only if Petitioner makes "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). Where, as here, the district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* Petitioner has failed to make "a substantial showing

of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Upon consideration of the record, the Court concludes that no certificate of appealability shall issue.

## VI. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Petitioner Carline Maurice's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, **ECF No. [1]**, is **DENIED**.

2. No certificate of appealability shall issue.

3. To the extent not otherwise disposed of, any pending motions are **DENIED AS MOOT** and all deadlines are **TERMINATED**.

4. The Clerk of Court is directed to **CLOSE** this case.

**DONE AND ORDERED** in Chambers at Miami, Florida, on October 1, 2021.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

Carline Maurice
#12700-104
Coleman Federal Correctional Complex-Camp
Inmate Mail/Parcels
Post Office Box 1027
Coleman, FL 33521-1027
PRO SE